436 A.2d 1376

**COMMONWEALTH of Pennsylvania,**

v.

**Albert A. SUDLER, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 18, 1981.

Decided Oct. 14, 1981.

Reargument Denied Nov. 30, 1981.

John J. Grenko, Reading, for appellant.

George C. Yatron, Dist. Atty., Charles M. Guthrie, Jr., Asst. Dist. Atty., for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, WILKINSON and KAUFFMAN, JJ.

OPINION OF THE COURT

ROBERTS, Justice.

This is an appeal from a judgment of sentence of the Court of Common Pleas of York County imposed on convictions of murder of the first degree, burglary, and rape. Appellant challenges the sufficiency of the evidence on which the convictions were based, as well as the legality of his arrest, a search of his residence, and a statement which he had given to police. We conclude that the evidence does not support the conviction of rape. However, we also conclude that the record is free of error in all other respects. Accordingly, the judgment of sentence is modified and, as modified, affirmed.

## I

The body of the victim, an 80 year old widow, was found on the morning of December 10, 1978, in the bedroom of her apartment where she had lived alone. The victim's throat had been slashed, causing her death. There were also lacerations of the hands, face, and chest. The assailant had entered the victim's apartment through a kitchen window and had ransacked a considerable portion of the apartment, including the bedroom, searching for valuables. Medical examination revealed the presence of sperm in the victim's vagina.

On December 13, three days after the victim's body had been discovered, two acquaintances of appellant gave information to police concerning the crime. In sworn statements, both persons told police that appellant had admitted killing the victim. One of the persons, who saw appellant on the morning that the body had been discovered, stated that appellant had told him that he "used his big knife" to cut the throat of the "lady that lives near the playground," and had taken some whiskey from her apartment. This person stated that he had observed a red substance on appellant's shoes, which appellant had identified as blood. The other person supplied police with substantially the same information, and additionally told police that appellant had shown him a knife which appellant claimed to have used to kill the victim.

Police appeared before a magistrate on the same day they received the sworn statements of appellant's acquaintances, seeking a warrant for appellant's arrest, as well as a warrant to search appellant's residence. In supporting affidavits, police identified one of the acquaintances as Nelson Quinones, "an individual previously used as a witness in a criminal prosecution in Berks County and whose honesty and truthful demeanor has been established in the eyes of the Court. . . ." Police did not include the name of the other supplier of information in the affidavit because of a "fear of retribution . . . ."

The magistrate issued the warrants late that evening and police executed the warrants in the early hours of the

following morning, December 14, at approximately 4:00 a. m. As a result of a search of the premises, police recovered items of clothing, a knife with a blade of approximately eighteen inches, and two empty bottles of whiskey. Upon taking appellant into custody, police advised appellant of his *Miranda* rights and transported him to police headquarters. There he was once again advised of his rights. After questioning, appellant supplied police with a statement, subsequently reduced to writing by police and signed by appellant, in which he admitted breaking into the victim's apartment, killing the victim with his knife, and taking liquor. However, appellant also stated: "I didn't mess with her or anything like that. I don't remember messing with her like that; no, no. I didn't have any sex with her."

In pre-trial motions, appellant challenged the legality of his arrest and the evidence seized pursuant to the search warrant. The Court of Common Pleas of Berks County denied relief, but granted appellant's application for a change of venue. The matter was then tried before a jury in York County. The Commonwealth presented ample evidence in support of its charges of murder of the first degree and burglary. As to the charge of rape, the Commonwealth established that the victim had no male acquaintances and that appellant was the only person who had entered the victim's residence on the night of the killing. Through expert testimony, the Commonwealth also established the presence of sperm in the victim's vagina. On cross-examination, the Commonwealth's expert admitted that he could not tell how long the sperm had been there.

After returning its verdicts of guilty, the jury found the presence of mitigating circumstances. Written post-verdict motions were denied, and a sentence of life imprisonment on the murder conviction was imposed. In addition, sentences of ten to twenty years' imprisonment were imposed on the burglary and rape convictions. These latter sentences were to run concurrent to each other, but consecutive to the sentence imposed on the murder conviction. This appeal followed.

## II

■ Under the statutes in effect at the time this appeal was filed, authority to review appellant's homicide conviction is allocated to this Court, see Historical Note to 42 Pa.C.S.A. § 722 (1981), while authority to review the burglary and rape convictions is allocated to the Superior Court, 42 Pa.C.S. § 742. Although these statutory provisions are phrased in terms of "jurisdiction," another provision relating to our appellate court provides:

> "[T]he failure of an appellee to file an objection to the jurisdiction of an appellate court within such time as may be provided by general rule, shall, unless the appellate court otherwise orders, operate to perfect the appellate jurisdiction of such appellate court, notwithstanding any provision of this title, or of any general rule, adopted pursuant to section 503 (relating to reassignment of matters), vesting jurisdiction of such appeal in another appellate court."

42 Pa.C.S. § 704(a). Thus the term "jurisdiction" is used to denote which appellate court has primary responsibility for a particular matter, permitting an appellate court in which a matter is erroneously filed to dispose of the matter in its discretion, absent timely objections.

This Court has on occasion declined to review non-homicide matters more properly presented to the Superior Court, even where the Commonwealth has not raised a jurisdictional objection. See, e. g., *Commonwealth v. Hollis*, 483 Pa. 427, 397 A.2d 417 (1979); *Commonwealth v. O'Bryant*, 479 Pa. 534, 388 A.2d 1059 (1978). However, on these occasions, the non-homicide matter had also been appealed to the Superior Court. Thus our decisions not to review the non-homicide matter reflected the judgment that the resources of the Superior Court which had already been utilized to process the appeal should not be wasted and duplicated by this Court.

■ Here, no such appeal to the Superior Court appears of record, and the Commonwealth has filed no jurisdictional

objection. In a similar procedural setting, where the appellee voiced only "belated objection," this Court observed that "judicial economy would be best served by assuming jurisdiction over the entire matter." *Commonwealth v. Shain*, 493 Pa. 360, 363 n.1, 426 A.2d 589, 590 n.1 (1981). The same concern for judicial economy justifies our consideration of all issues presented here, including those relating to the burglary and rape convictions.

## III

■ In reviewing the sufficiency of the evidence, we are obliged to view all of the evidence presented at trial in the light most favorable to the Commonwealth, the verdict-winner, and to draw all reasonable inferences in the Commonwealth's favor. E. g., *Commonwealth v. Moore*, 488 Pa. 361, 412 A.2d 549 (1980); *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976). So too, it must be borne in mind that

"it is not this Court's function to disturb the jury's factual determination. 'It is a basic tenet of our system of jurisprudence that issues of credibility are properly left to the trier of fact for resolution.' *Commonwealth v. Whack*, 482 Pa. 137, 140, 393 A.2d 417, 419 (1978). In exercising this prerogative, '[t]he fact-finder is free to believe all, part, or none of the evidence.' *Commonwealth v. Rose*, 463 Pa. 264, 268, 344 A.2d 824, 826 (1975)."

*Commonwealth v. Arms*, 489 Pa. 35, 39, 413 A.2d 684, 686 (1980).

■ Viewed from this perspective, the record beyond question supports the jury's verdicts of guilty of murder of the first degree and burglary. However, the same cannot be said of the guilty verdict on the rape charge.

■ Our reading of the Crimes Code convinces us that penetration after a victim's death is not within the definition of rape. Rape is defined as follows:

"A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged or deficient that such person is incapable of consent."

18 Pa.C.S. § 3121. By contrast, under 18 Pa.C.S. § 5510 the Legislature provides:

"Except as authorized by law, a person who treats a corpse in a way that he knows would outrage ordinary sensibilities commits a misdemeanor of the second degree."

The Model Penal Code Comment to the section upon which section 5510 was based states:

"There are occasional legislative provisions penalizing sexual relations with or disrespectful treatment of corpses. The section is included here rather than in the chapter on sexual offenses because there we were concerned primarily with preventing physical aggressions, whereas here we deal with outrage to the feelings of surviving kin, outrage which can be perpetrated as well by mutilation or gross neglect as by sexual abuse."

American Law Institute, Model Penal Code § 250.10 Comment at p. 40 (Tent. Draft No. 13). When the language of the definition of rape is considered in light of this comment, it is clear that the Legislature intended the crime of rape to encompass only indignities to the living.

■ Here the Commonwealth charged appellant only under the "forcible compulsion" subsection of the rape statute, 18 Pa.C.S. § 3121(1). Although the evidence supports a conclusion that appellant was responsible for the presence of sperm in the victim's vagina, there is no evidence to support a conclusion beyond a reasonable doubt that penetration occurred before the killing. Neither eyewitness testimony nor testimony of the victim could be presented. Nor was there presented any evidence of force, which our cases have

viewed as sufficient to suggest "forcible compulsion." See, e. g., *Commonwealth v. Perrin*, 484 Pa. 188, 398 A.2d 1007 (1979); *Commonwealth v. Williams*, 476 Pa. 557, 383 A.2d 503 (1978).

Evidence of force is not necessary to support a rape conviction where, for example, a complainant testifies that she did not resist the aggressor because she feared further injury. Here, however, on a record containing no such testimony, or probative physical evidence, the lack of evidence of force is as consistent with the conclusion that penetration occurred after the killing as with the conclusion that the victim was afraid to resist. Thus it cannot be said that the jury could conclude, beyond a reasonable doubt, that rape had been committed.

## IV

Appellant's challenges to the legality of his arrest and the search of his residence are based upon the failure of police to include in their affidavits accompanying the arrest and search warrants the name of one of the two persons supplying police with information. Appellant contends that, as a result, police provided no basis for their judgment that the "informant" was either inherently credible or reliable on this occasion, as required by *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

Initially, it must be pointed out that appellant inappropriately seeks to be discharged because of the allegedly unlawful arrest. The only "fruit" of the allegedly unlawful arrest which appellant has identified is his person. It is well settled that a person convicted cannot avoid the verdict merely by pointing to an illegal arrest. See, e. g., *Commonwealth v. Krall*, 452 Pa. 215, 304 A.2d 488 (1973). Cf. *Commonwealth v. Polsky*, 485 Pa. 360, 402 A.2d 1003 (1979) (extradition). As the Supreme Court of the United States has recently reaffirmed, "[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d

537 (1980). Thus we consider the challenge to the veracity of the person supplying police with part of their information only to the extent that it affects the legality of the search warrant and evidence seized.

In focusing his attack on the veracity of the person not named in the affidavit, appellant has failed to demonstrate any infirmity regarding the veracity of the other person supplying police with information, Nelson Quinones, whose identity the police disclosed to the issuing authority in their affidavit.

■ Although Quinones was an "informant" in the sense that he advised police of appellant's admissions of criminal conduct, he was not an informant in the sense that police became obliged, under *Aguilar* and *Spinelli*, to show his veracity to the issuing authority. Unlike in the typical informant case, where there exists the potential that the informant is acting out of self-interest, here there is no basis to conclude that Quinones was motivated by anything other than good citizenship in making his disclosure. Moreover, the affidavit indicates that Quinones had testified, with credibility, in a previous court proceeding.

It has been observed that the *Aguilar-Spinelli* test "should not be applied in a wooden fashion to cases where the information comes from an alleged victim of or witness to a crime." *United States v. Burke*, 517 F.2d 377, 380 (2d Cir. 1975). There is no reason to distinguish this case, involving a named citizen who comes forward, from those where a victim or witness is involved. As Professor LaFave has observed, "when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case." LaFave, II Search and Seizure § 3.4(a) at 592 (1978). No such "special circumstances" are present here, and it must be concluded that Quinones' veracity has been established.

■ In a case where two independent sources of information were presented which, "standing alone, arguably [did]

not possess a sufficient guarantee of reliability to create the probable cause necessary to issue a search warrant," this Court held:

> "When two *independent* informants both supply the same information about a particular crime to the police, each source tends inherently to bolster the reliability of the other. Although the information supplied by one questionable source may be insufficient, the probability is extremely small that a second independent source would supply identical information if it were not probably accurate."

*Commonwealth v. Mamon*, 449 Pa. 249, 259, 297 A.2d 471, 477 (1972). It follows that where, as here, police properly have relied upon sufficient information supplied by a named, disinterested citizen who came forward voluntarily, any objection to the warrant based on the lack of veracity of another person cannot prevail.

## V

Appellant's remaining contention, a challenge to the legality of the statement which appellant gave to police, relies exclusively upon appellant's own testimony at the suppression hearing, including a statement that he had been using drugs shortly before the time of his arrest. In appellant's view, the "totality of the circumstances," as he described them, should have been believed by the suppression court, and the statement ruled involuntary. Appellant's contention cannot prevail. His version of the "circumstances" directly contradicts the version presented by the officer who had interviewed appellant and accepted his statement. The suppression court's decision to credit the officer's testimony is supported by the record and, thus, must not be disturbed. See, e. g., *Commonwealth v. Arms*, supra.

Judgment of sentence on the rape conviction reversed. Judgment of sentence on the murder and burglary convictions affirmed.

NIX and LARSEN, JJ., filed concurring and dissenting opinions in which KAUFFMAN, J., joins.

NIX, Justice, concurring and dissenting.

Although I join in that part of the majority opinion affirming appellant's convictions of murder of the first degree and burglary, I strongly dissent from the majority's conclusion that the jury could not find that rape had been committed.

The majority states that "[a]lthough the evidence supports a conclusion that appellant was responsible for the presence of sperm in the eighty year old victim's vagina, there is no evidence to support a conclusion beyond a reasonable doubt that penetration occurred before the killing. . . . *Nor was there presented any evidence of force . . . .*" At 1380 (emphasis added). However, in the instant case, there can be no doubt that the requirement of "forcible compulsion" for rape, 18 Pa.C.S.A. § 3121(1), cannot be separated from that force which was employed to commit t' e instant murder.

This Court has consistently decided "that if a homicide occurs in the perpetration of or attempt to perpetrate a robbery *or other statutorily enumerated felonies*, a conviction of [felony] murder . . . will be sustained regardless of when the design to commit the robbery or other felony was conceived *or the felony committed.*" *Commonwealth v. Tomlinson*, 446 Pa. 241, 246–47, 284 A.2d 687, 690 (1971) (emphasis added).

While this language is admittedly ambiguous, it is nevertheless based upon sound policy as it recognizes the difficulty in attempting to ascertain when the intent to rob was conceived in a given factual situation. This difficulty was emphasized in *Commonwealth v. Hart*, [403 Pa. 652, 170 A.2d 850 (1961)] when we noted that "defendant would require a televised stop-watch in every robbery or felony-killing to prove that the felonious intent existed before the attack. It is rare, we repeat, that a criminal telephones or telegraphs his criminal intent and consequently such intent can be properly found by the jury from the facts and circumstances in a particular case." 403 Pa. at 658, 170 A.2d at 853–54. In all probability the rule would be better restated to indicate that *if the killing*

> *is used to effectuate the robbery then it is immaterial that the intent to kill preceded the intent to rob since the force resulting in death is the force used to accomplish the robbery.*
>
> *Commonwealth v. Butcher,* 451 Pa. 359, 363, 304 A.2d 150, 152 (1973) (emphasis added).

Similarly, the mere fact that penetration may have occurred within moments after a brutal murder rather than immediately prior to the murder does not negate the obvious fact that the force employed to kill is one and the same to that force which is sufficient to constitute "forcible compulsion" under 18 Pa.C.S.A. § 3121.

In addition, the majority admits that on cross-examination, the Commonwealth's expert admitted that he could not tell how long the sperm had been in the victim's vagina. Moreover, the majority's reliance on 18 Pa.C.S.A. § 5510[1] is misplaced. It would be absurd to construe this section as encompassing a situation, such as here, where the killing and the intercourse occurred within such a short span of time and the person responsible for the intercourse was the person who also committed the murder.

While it is true the legislature intended the crime of rape to encompass indignities to the living, the crime of rape may also be committed when the rape and murder are committed during the same criminal episode. Penetration in the instant case was the culmination of the forcible attack and killing of the victim. Whether this occurred immediately prior to or immediately subsequent to the moment of death is irrelevant and the conviction for rape should be affirmed.

KAUFFMAN, J., joins in this opinion.

LARSEN, Justice, concurring and dissenting.

I dissent from the majority's reversal of the judgment of sentence for rape.

---

1. 18 Pa.C.S.A. § 5510 provides:
   Except as authorized by law, a person who treats a corpse in a way that he knows would outrage ordinary sensibilities commits a misdemeanor of the second degree.

There is no question that the eighty year-old victim was alive when appellant began his murderous assault, and that brutal and lethal force was used on her. Further, as the majority correctly notes, "the evidence supports a conclusion that appellant was responsible for the presence of sperm in the victim's vagina." This would certainly seem to justify the jury's finding that appellant engaged in sexual intercourse with the victim by forcible compulsion. See 18 Pa.C.S.A. § 3121.

The majority, however, finds this evidence insufficient because there is no proof that the elderly victim was alive at the time of appellant's penetration of her vagina. In my opinion, it is of absolutely no moment if a victim who is alive at the time a rapist begins his assault breathes her last dying gasp before or after the assailant achieves penetration, and the definition of rape which is contained in section 3121 of the Crimes Code[1] admits of no such requirement. Further, the portion of the Model Penal Code quoted by the majority does not support reading such a requirement into the crime of rape, but rather, militates against it. That portion of the Model Penal Code addresses itself to penal provisions concerning the mistreatment of corpses and provides:

> There are occasional legislative provisions penalizing sexual relations with or disrespectful treatment of corpses. The section is included here rather than *in the chapter on sexual offenses* because there *we were concerned primarily with preventing physical aggressions,* whereas *here we deal with outrage to the feelings of surviving kin,* outrage which can be perpetrated as well by mutilation or gross neglect as by sexual abuse. (emphasis supplied).

1. That section provides:
   A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:
   (1) by forcible compulsion;
   (2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;
   (3) who is unconscious; or
   (4) who is so mentally deranged or deficient that such person is incapable of consent.

American Law Institute, Model Penal Code § 250.10 Comment at p. 40 (Tent. Draft No. 13). Certainly the primary interest at stake in the instant situation is that of the victim to be free of appellant's ruthless onslaught of physical aggression, and not that of her surviving kin in having their feelings protected. Accordingly, appellant's conduct should be held to be rape without regard to whether the victim passed away before or after appellant completed his sexual objectives.

Applying Mr. Justice Roberts' view renders it impossible for the Commonwealth to obtain a conviction for the crime of rape or the crime of having intercourse with a corpse whenever either crime has been accompanied by the murder of the victim. If charged with rape the defendant says "prove the victim was still alive during the actual rape"; and if charged with intercourse with a corpse, the defendant says "prove the victim was dead during the sexual act" . . . and, unless there were eyewitnesses during the savagery, the matter is incapable of proof. All of which makes the law absurd.

The judgment of sentence should, therefore, be affirmed.

KAUFFMAN, J., joins in this dissenting opinion.